UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

-------------------------------------------------- :
In re:                                            :    Chapter 11
                                                  :
OWENS CORNING, *et al.*,                          :    Case No. 00-03837 (JKF)
                                                  :    Jointly Administered
                                                  :
                              Debtors.            :
-------------------------------------------------- :
                                                  :
THE OFFICIAL REPRESENTATIVES OF THE :
BONDHOLDERS AND TRADE CREDITORS  :
OF DEBTORS OWENS CORNING, *et al.*                :
                                                  :    Adv. Pro. No. 06-50122 (JKF)
                              Plaintiffs,         :
                                                  :
                 v.                               :    Related Doc. No. 8
                                                  :
CREDIT SUISSE FIRST BOSTON, individually :
and in its capacity as Agent, *et al.*            :
                                                  :
                              Defendants.         :
-------------------------------------------------- 

**RESPONSE OF CREDIT SUISSE (i) IN SUPPORT OF DEBTOR AND NON-DEBTOR PLAINTIFFS' MOTION TO REFER FRAUDULENT TRANSFER ADVERSARY PROCEEDING TO THE BANKRUPTCY COURT AND (ii) IN OPPOSITION TO MOTION OF THE OFFICIAL REPRESENTATIVES OF THE BONDHOLDERS AND TRADE CREDITORS TO WITHDRAW THE REFERENCE WITH RESPECT TO EQUITABLE SUBORDINATION ADVERSARY PROCEEDING**

TO THE HONORABLE JOHN P. FULLAM,
SENIOR UNITED STATES DISTRICT JUDGE:

Credit Suisse, as Agent for itself and the other holders of prepetition bank claims (collectively with Credit Suisse, the "Banks") under the Credit Agreement, dated as of June 26, 1997, and related documents (as amended, the "Credit Agreement"), as and for its response (i) in support of the motion, dated February 3, 2006 (the "Referral Motion") of Owens Corning Corporation ("OCD") and each of the other above-captioned debtors and debtors in possession (collectively with OCD, the "Debtors") for an order referring the Fraudulent Transfer Adversary

(collectively with OCD, the "Debtors") for an order referring the Fraudulent Transfer Adversary

Proceeding (as defined below) from this Court to the United States Bankruptcy Court for the

District of Delaware (the "Bankruptcy Court") and (ii) in opposition to the motion, dated

February 13, 2006 (the "Withdrawal Motion"), of the "official representatives" of bondholders

and trade creditors ("John Hancock")[1] for an order withdrawing the reference to the Bankruptcy

Court with respect to the Equitable Subordination Adversary Proceeding (as defined below),

respectfully represents as follows:

## I.

## PRELIMINARY STATEMENT

1.    John Hancock was one of the key supporters of the Debtors' unsuccessful

efforts at substantive consolidation. Now that the United States Court of Appeals for the Third

Circuit (the "Third Circuit") has ruled, the Debtors, the asbestos plaintiffs, and the Banks have

reached agreement on the terms of a plan of reorganization, which the Debtors filed on

December 31, 2005 (the "Fifth Plan").

2.    Notwithstanding that the treatment under the Fifth Plan for the holders of

the Debtors' publicly issued debt (the "Noteholders") -- the group John Hancock purports to

represent -- is significantly better than under the Debtors' previous plan, John Hancock is not

satisfied. It now seeks to oppose the Fifth Plan through a barrage of frivolous and redundant

litigation. On January 6, 2006, it commenced an adversary proceeding seeking, among other

things, to equitably subordinate the claims of the Banks and to pierce the corporate veil among

---

[1] The self-styled "official representatives of bondholders and trade creditors" cannot credibly maintain that their narrow interests are congruent with the global interests of all Noteholders and trade creditors. These "official representatives" are comprised of only one creditor, John Hancock Life Insurance Company, a holder of certain OCD public debt, and Wilmington Trust Company, the indenture trustee for such debt. Notably, no trade creditor is among the "official representatives of bondholders and trade creditors."

the Debtors and their non-Debtor subsidiaries (the "Equitable Subordination Adversary Proceeding") -- i.e., in essence, the same substantive relief the Third Circuit has already denied. On January 20, 2006, John Hancock filed a motion seeking to prosecute a fraudulent transfer adversary proceeding (the "Fraudulent Transfer Adversary Proceeding") commenced by the Debtors three and one-half years ago and since abandoned in the context of the agreement on the Fifth Plan.

3.      It is not clear whether John Hancock's motivation is to improve Noteholder recoveries at the expense of the Banks through the current litigation or at the expense of the asbestos plaintiffs by delaying confirmation of the Fifth Plan in the hope that Congress will enact the FAIR Act. What is clear is that John Hancock's efforts are nothing more than a collateral attack on the Fifth Plan, a point it has conceded several times.[2]

4.      A key initiative of John Hancock's assault on the Fifth Plan is its request to withdraw the reference of the Equitable Subordination Adversary Proceeding so that this Court would preside over that litigation as well as the Fraudulent Transfer Adversary Proceeding. Importantly, however, these actions involve "core" bankruptcy issues -- equitable subordination of claims, avoidance of fraudulent transfers, automatic stay relief, derivative standing to pursue estate actions, and objections to confirmation of the Fifth Plan -- that should be addressed by the Bankruptcy Court. As described in detail below, John Hancock has failed to establish any of the well-settled factors that the Third Circuit has held to be integral in determining whether "cause" exists to withdraw the reference to a bankruptcy matter.

5.      Consistency and uniformity of bankruptcy administration is compromised when challenges to claims under a proposed plan of reorganization are removed piecemeal from

---

[2] *See* Section III.A. *infra.*

the Bankruptcy Court and considered separately from the plan confirmation process as a whole.

John Hancock contends that litigating both the Equitable Subordination Adversary Proceeding

and the Fraudulent Transfer Adversary Proceeding (together, the "Adversary Proceedings")

before this Court will satisfy each side's desire to have both Adversary Proceedings heard by the

same court. This "solution," however, only ensures that the parties still will be litigating in two

courts. If the Adversary Proceedings are heard in this Court, John Hancock will nonetheless

prosecute its objections to confirmation of the Fifth Plan before the Bankruptcy Court and most

(if not all) of those objections will be duplicative of the issues raised in the Standing Motion (as

defined below) and the Adversary Proceedings. The sole solution that will bring all of these plan

of reorganization-related issues before one court is to grant the Debtors' Referral Motion, so that

the Standing Motion and the Adversary Proceedings can proceed in one forum -- the Bankruptcy

Court.

           6.      Notably, courts agree that motions to withdraw the reference made after a

plan of reorganization has been filed (such as the Withdrawal Motion here), and which are

designed to disrupt the confirmation process, are not "timely," and should be denied. The

confirmation process for the Fifth Plan is already underway. The Standing Motion and the

Adversary Proceedings are fundamentally objections to the Fifth Plan and the treatment it

provides, and therefore, should be considered by the Bankruptcy Court as part of the

confirmation hearings. The Court should refer the Standing Motion and the Fraudulent Transfer

Adversary Proceeding to the Bankruptcy Court for disposition together with the Equitable

Subordination Adversary Proceeding, and deny John Hancock's Withdrawal Motion.

## II.

## **BACKGROUND**

7.      In June 1997, OCD entered into a $2 billion revolving credit facility with

the Banks or their predecessors in interest pursuant to the Credit Agreement.  Each of OCD's

significant subsidiaries guaranteed OCD's obligations under the Credit Agreement (the

"Guarantee Obligations").  On October 5, 2000 (the "Commencement Date"), the Debtors

commenced these cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code").

8.      On October 3, 2002, the Debtors filed a complaint (the "Original

Fraudulent Transfer Complaint") commencing the Fraudulent Transfer Adversary Proceeding in

the Bankruptcy Court seeking, among other things, to avoid the Guarantee Obligations as

fraudulent transfers.  Significantly, the Fraudulent Transfer Adversary Proceeding, which was

filed on the last possible day to commence such action, was not precipitated by an analysis of the

merits of the underlying claims, but rather by the need to preserve such claims in the event it was

later determined that prosecuting the claims would be in the best interests of the estates.[3]  *See*

Motion to Stay Fraudulent Transfer Adversary Proceeding (as defined immediately below) at

¶ 13.

9.      On October 16, 2002, the Debtors filed a motion to stay the Fraudulent

Transfer Adversary Proceeding (the "Motion to Stay Fraudulent Transfer Adversary

Proceeding"), based on the Debtors' belief that "active pursuit of these claims at this time will

distract from the important task of negotiating and filing a plan of reorganization."  *Id.*

---

[3] At that point in time, prior to the Third Circuit's withdrawal of its opinion in *Cybergenics I*, 304 F.3d
316 (3d Cir. 2002) (opinion withdrawn), the Debtors were required under controlling law to preserve
arguably colorable claims to recover assets, notwithstanding their business judgment that such claims
were unlikely to succeed.

10.     By order, dated December 23, 2002 (the "Withdrawal Order"), District Judge Wolin withdrew the reference solely with respect to the Fraudulent Transfer Adversary Proceeding and the Debtors' then anticipated motion for substantive consolidation (the "Substantive Consolidation Motion").

11.     On December 31, 2002, John Hancock filed a motion to intervene in the Fraudulent Transfer Adversary Proceeding (the "Intervention Motion"). The Intervention Motion sought leave to file a complaint (the "Intervention Complaint") (i) intervening in the five counts alleged in the Original Fraudulent Transfer Complaint (the "Estate Claims") and (ii) adding John Hancock's direct claims (the "Direct Claims") against certain subsidiary guarantors for alleged common law and securities fraud in connection with the issuance of certain of OCD's public debt.

12.     On January 17, 2003, the Debtors filed the Substantive Consolidation Motion. District Judge Wolin stayed the Fraudulent Transfer Adversary Proceeding (and all motions pending therein) pending a decision on the Substantive Consolidation Motion. The Debtors also filed a proposed Fourth Amended Plan of Reorganization (the "Fourth Plan"), which was premised on substantive consolidation of the Debtors' estates together with certain non-Debtor subsidiaries. Based on a term sheet, dated as of June 3, 2004 (the "Term Sheet"), which increased the recoveries of unsecured creditors, including the Noteholders, from 29.5% to 39.5%, John Hancock committed to support the Fourth Plan.

13.     By decision dated August 15, 2005, the Third Circuit Court held that substantive consolidation was not appropriate in these chapter 11 cases (the "Substantive Consolidation Decision"). In light of the Substantive Consolidation Decision, the Debtors reformulated the Fourth Plan.

14.    On December 31, 2005, the Debtors filed the Fifth Plan, which recognizes the corporate separateness of each Debtor and non-Debtor entity and releases all of the estates' causes of action against the Banks, including those asserted in the Original Fraudulent Transfer Complaint (the "Bank Release"). Notably, the Fifth Plan provides that the Noteholders will receive a recovery of 49% of their claims -- an increase of approximately 25% over the 39.5% recovery set forth in the Term Sheet that John Hancock signed.[4]

15.    On January 6, 2006, John Hancock filed (and, on January 19, 2006, served) a complaint (the "Equitable Subordination Complaint") commencing the Equitable Subordination Adversary Proceeding in the Bankruptcy Court seeking, among other things, the equitable subordination of the Banks' claims against OCD and to pierce the corporate veil between OCD and of certain non-Debtor subsidiaries.

16.    On January 20, 2006, John Hancock filed a motion (the "Standing Motion") seeking to amend the Intervention Motion for the purposes of (i) prosecuting the Estate Claims on behalf of the estates (as opposed to simply intervening in the Estate Claims as requested pursuant to the initial Intervention Motion) and (ii) amending the Intervention Complaint to include (A) the Estate Claims, (B) the Direct Claims, and (C) additional direct claims of John Hancock against Credit Suisse. John Hancock's proposed amended Intervention Complaint (the "Amended Intervention Complaint") asserts 10 counts, four of which are included in the Original Fraudulent Transfer Complaint, and the rest of which virtually are identical to counts in the Equitable Subordination Complaint.

---

[4] In the Standing Motion and the Withdrawal Motion, John Hancock asserts that the modifications in the Fifth Plan were undertaken "at the expense of" the Noteholders and trade creditors of OCD. However, John Hancock's initial support for a 39.5% distribution and subsequent opposition to a 49% distribution exposes John Hancock's true motivations -- to delay confirmation and coerce a larger plan distribution.

17.    On or about February 3, 2006, the Debtors filed the Referral Motion. In response thereto, on February 13, 2006, John Hancock filed the Withdrawal Motion.

### III.

### JOHN HANCOCK HAS NOT ESTABLISHED CAUSE TO WITHDRAW THE REFERENCE OF THE EQUITABLE SUBORDINATION ADVERSARY PROCEEDING

18.    Section 157(d) of title 28 of the United States Code provides: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d). The requirement to show cause "creates a 'presumption that Congress intended to have bankruptcy proceedings adjudicated in the bankruptcy court unless rebutted by a contravening policy.'" *See Hatzel & Buehler, Inc. v. Cent. Hudson Gas & Elec.*, 106 B.R. 367, 371 (D. Del. 1989) (quoting *In re DeLorean Motor Co.*, 49 B.R. 900, 912 (Bankr. E.D. Mich. 1985)); *see also In re Pruitt*, 910 F.2d 1160, 1168 (3d Cir. 1990) (quoting with approval the United States Court of Appeals for the Seventh Circuit, which noted the "statutory objective[] of utilizing the expertise of bankruptcy judges . . . ."). The Third Circuit has identified five factors that the district court should consider in determining whether to withdraw the reference: (i) promoting uniformity in bankruptcy administration, (ii) reducing forum shopping and confusion, (iii) conserving the debtors' and creditors' resources, (iv) expediting the bankruptcy process, and (v) the timing of the request for withdrawal. *See Pruitt*, 910 F.2d at 1168; *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993) *cert denied*, 511 U.S. 1021 (1994). The movant bears the burden of showing that cause exists. *See NDEP Corp. v. Handl-It Inc.*, 203 B.R. 905, 907 (D. Del. 1996).

19.    As discussed below, the issues in the Standing Motion and the Adversary Proceedings are all core bankruptcy issues that directly impact the confirmability of the Fifth

Plan. There is no credible reason for litigating these issues in this Court. Moreover, John Hancock has not demonstrated how litigation of these issues in this Court will promote any of the goals underlying the five factors the Third Circuit has identified for consideration when the district court is faced with a request to withdraw the reference from the bankruptcy court.

### A.    The Standing Motion And The Adversary Proceedings Involve Core Bankruptcy Issues That Should Be Resolved In The Bankruptcy Court To Promote Uniformity In Bankruptcy Administration

20.    Courts have recognized that the first step in the analysis of whether to withdraw from the bankruptcy court the reference of a case or proceeding is to determine whether the issues in dispute are core or non-core. "[I]t is upon the issue of coreness 'that questions of efficiency and uniformity will turn.'" *NDEP Corp. v. Handl-It Inc.*, 203 B.R. at 908 (quoting *Orion*, 4 F.3d at 1101); *see also In re Am. Capital Equip., LLC*, 325 B.R. 372, 378 (W.D. Pa. 2005).

21.    Hearing core matters in a district court raises a material risk of the "inefficient allocation of judicial resources" because the bankruptcy court can adjudicate core matters to final binding judgment, and because core matters often involve facts with which the bankruptcy court is already familiar as well as legal issues within the bankruptcy court's expertise. *See Orion*, 4 F.3d at 1101; *see also Northwestern Inst of Psychiatry Inc. v. Travelers Indem. Co.*, 272 B.R. 104, 109 (E.D. Pa. 2001). "[T]he uniformity of administration would always suffer by [a core] matter's adjudication by an Article III court rather than the bankruptcy court." *See AFCO Credit Corp. v. Iridium L.L.C.*, No. 01 CIV 3595, 2001 WL 1658233, at *1 (S.D.N.Y. 2001); *see also In re American Classic Voyages Co.*, No. 01-10954, 2006 WL 288123, at *2 (D. Del. 2006) ("because it is a core proceeding with which the Bankruptcy Court is already familiar, the continued handling of the matter by the Bankruptcy Court would ... promote uniformity in bankruptcy administration"); *Schubert v. Lucent Technologies, Inc.*, No.

01-01430, 2004 WL 2713101, at *4 (D. Del. 2004) (finding, among other things, <u>equitable subordination</u> claims purely bankruptcy related and, because resolution of these claims will affect the distribution to creditors, considerations of uniformity in bankruptcy administration support the proceeding being heard in the bankruptcy court).

22.    The issues raised in the Standing Motion and the Adversary Proceedings are core bankruptcy issues.  Specifically, John Hancock seeks equitable subordination pursuant to section 510(c) of the Bankruptcy Code, avoidance of transfers pursuant to sections 544, 548, and 550 of the Bankruptcy Code, reduction and disallowance of Credit Suisse's proof of claim (filed for itself and on behalf of all of the Banks) pursuant to section 502(a) of the Bankruptcy Code and Bankruptcy Rule 3007, derivative standing to prosecute estate actions on behalf of the Debtors' estates pursuant to established bankruptcy case law, and relief from the automatic stay pursuant to section 362(d) of the Bankruptcy Code.  At the same time, John Hancock has advised the parties that it intends to object to confirmation of the Fifth Plan.  All these matters are "core matters" pursuant to section 157 of title 28 of the United States Code:

- 157(b)(2)(B) - allowance or disallowance of claims against the estate;

- 157(b)(2)(E) - orders to turn over property of the estates;

- 157(b)(2)(G) - motions to terminate, annul, or modify the automatic stay;

- 157(b)(2)(H) - proceedings to determine, avoid, or recover fraudulent conveyances; and

- 157(b)(2)(L) - confirmation of plans.

28 U.S.C. § 157(b)(2)(B), (E), (G), (H), and (L).  Given that the Standing Motion and the Adversary Proceedings concern core, bankruptcy-related claims, and considering the extensive bankruptcy expertise necessary to resolve such claims, John Hancock's assertion that the Bankruptcy Court is the second-best court to resolve these matters is wholly unsubstantiated, not

only by the case law, but also by Delaware Local Bankruptcy Rule 5011-1. As noted by Bankruptcy Judge Fitzgerald at a hearing in the Bankruptcy Court held on February 21, 2006, such rule expressly governs the procedure for the filing of motions to withdraw the reference from the Bankruptcy Court. The rule requires that the movant file "a motion for a determination by the Bankruptcy Court with respect to whether the matter or proceeding is core or non-core." *Id.* Such motion for a determination must be filed concurrently with the motion seeking withdrawal of the reference. *Id.* John Hancock has not filed the required motion before the Bankruptcy Court, and therefore, should be barred from arguing that any of the issues raised in the Equitable Subordination Adversary Proceeding are non-core when the Bankruptcy Court has not yet spoken.[5]

23.    The Standing Motion is itself premised on a bankruptcy court-created doctrine that is unique to bankruptcy cases -- derivative standing to prosecute claims on behalf of the estates. To prosecute the Fraudulent Transfer Adversary Proceeding, John Hancock must demonstrate that (i) the asserted claims are colorable, (ii) the Debtors' refusal to prosecute such claims is "unjustified," and (iii) that it is in the best interests of the estates to allow John Hancock to assume and resume prosecution of the Fraudulent Transfer Adversary Proceeding.[6] *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003); *Louisiana World Exposition v. Fed. Ins. Co. (In re Louisiana World)*, 858 F.2d 233 (5th Cir.

---

[5] Alternatively, at a minimum, John Hancock should be required to file a motion in the Bankruptcy Court as set forth in Delaware Local Bankruptcy Rule 5011-1 on or before February 28, 2006 for a determination by the Bankruptcy Court that the issues raised in the Equitable Subordination Adversary Proceeding are core or non-core so as not to further delay the bankruptcy process or the resolution of the issues raised in the Standing Motion and the Adversary Proceedings.

[6] Pursuant to the Joint Stipulation and Motion to Extend Time and Set Briefing Schedule filed in this Court on February 10, 2006, the responsive pleadings of the Debtors and the Banks in respect of the Standing Motion will be filed on March 21, 2006.

1988); *Unsecured Creditors Comm. v. Noyes* (*In re STN Enters.*), 779 F.2d 901 (2d Cir. 1985);

*Infinity Investors Ltd. v. Kingsborough* (*In re Yes! Entm't Corp.*), 316 B.R. 141, 145 (D. Del.

2004). All of these issues are more efficiently determined, and are routinely dealt with, in a

bankruptcy court. Moreover, having presided over these chapter 11 cases for more than five

years, Judge Fitzgerald is best situated to hear and determine what actions are and are not in the

best interests of the estates.

   24. Not only are these issues "core" to the bankruptcy process, they are

inextricably intertwined with confirmation of the Fifth Plan because they go to the heart of the

nature, extent, and validity of the Banks' claims, and the resources available to the Debtors'

estates to satisfy such claims. As such, they are core plan of reorganization issues that the

Bankruptcy Court should deal with as plan confirmation objections and determine in the context

of a plan confirmation hearing.

   25. Notably, John Hancock conceded at the January 30, 2006 hearing before

the Bankruptcy Court that the issues raised in the Standing Motion and the Adversary

Proceedings are really confirmation issues:

> I don't even fundamentally disagree with the debtor's characterization of
> at least some of these points as confirmation issues. Indeed, one of the
> fundamental claims, if you will, in the District Court litigation is in fact an
> objection styled as an objection to the bank's claims. It was so
> characterized that way by the debtor, and we have retained that
> characterization. Our principal objective here is inasmuch as a great deal
> of the discovery, by no means all that would be necessary but a great deal
> of it has already been completed in the context of the Sub-Con litigation.
> Our principal point here is to simply get the rest of this discovery going
> out of the way before a confirmation hearing is scheduled. In the
> anticipation, I certainly know the debtor is hopeful of getting something
> scheduled either late summer, early fall in the anticipation that we will
> then be in a position at a confirmation hearing to get rulings on all of these
> issues in an appropriate and well-considered way.

January 30, 2006 Hearing Transcript (the "January 30 Transcript") at 29 (Statements by Andrew
Rahl, on behalf of John Hancock). Copies of the relevant pages of the January 30 Transcript are
annexed hereto as Exhibit A.

26.    Although in the Withdrawal Motion, John Hancock attempts to diffuse its
counsel's concessions, the January 30 Transcript speaks for itself. At that hearing, counsel for
John Hancock clearly agreed to resolve the issues raised in the Standing Motion and the
Adversary Proceedings in connection with confirmation:

> MR. PERNICK: Your Honor, I actually had a moment to just confer with
> everybody. I think if Mr. Rahl is agreeing to litigate those issues all
> within confirmation, we will agree that we will figure out cooperatively a
> discovery schedule that accommodates the confirmation hearing dates that
> Your Honor set.
>
> THE COURT: Okay.
>
> MR. RAHL: That's fine, Your Honor.

January 30 Transcript at 52. Moreover, John Hancock admits that it has filed the Standing
Motion to remedy a purported infirmity of the Fifth Plan -- the Bank Release -- which
undoubtedly will also be the subject of its objection to confirmation. *See* Standing Motion at
¶ 24-26.

27.    The Standing Motion and the Adversary Proceedings are comprised of
numerous core bankruptcy issues. As such, John Hancock cannot demonstrate that withdrawing
the reference of these core issues would in any way promote uniformity in bankruptcy
administration.

**B.    John Hancock's Withdrawal Motion Is A Deliberate Effort
To Forum Shop And Inject Confusion Into The Plan Process**

28.    Discretionary withdrawal of the reference should be denied where the
bankruptcy court's retention of the matter reduces forum shopping. *See In re Am. Capital*

*Equip., LLC*, 325 B.R. 372, 378-79 (W.D. Pa. 2005); *Pension Benefit Guaranty Corp. v. Smith Corona Corp. (In re Smith Corona Corp.)*, 205 B.R. 712, 716 (D. Del. 1996); *Hatzel & Buehler, Inc. v. Cent. Hudson Gas & Elec.*, 106 B.R. 367, 371 (D. Del. 1989); *Superior Precast v. Buckley & Co.*, 1998 WL 110594, *3 (E.D. Pa. 1998).

29.    Here, all parties agree that the Equitable Subordination Adversary Proceeding and the Standing Motion (and, if the Bankruptcy Court grants the Standing Motion, the Fraudulent Transfer Adversary Proceeding) should be heard by the same court, but disagree as to the appropriate forum. OCD, its Debtor and non-Debtor subsidiaries, and the Banks assert that these proceedings belong before the Bankruptcy Court. As noted above, John Hancock has conceded that the Standing Motion and the Adversary Proceedings are, in effect, confirmation objections. Nevertheless, John Hancock asserts inexplicably that these actions should be heard in this Court.

30.    John Hancock offers no credible explanation as to why its confirmation objections should be heard by this Court. If the Adversary Proceedings and the Standing Motion are heard by this Court, it simply will ensure that the parties will still be litigating in <u>two</u> courts. John Hancock will still prosecute its objections to confirmation before the Bankruptcy Court. Most (if not all) of those objections will be duplicative of the numerous issues raised in the Standing Motion and the Adversary Proceedings. While purporting to have as its singular objective the common goal of all parties to be before one court, John Hancock's Withdrawal Motion is actually a veiled (or not so veiled) attempt to foster simultaneous, duplicative litigation in this Court and the Bankruptcy Court to disrupt and cloud the confirmation process. This is textbook forum shopping. Granting the Debtors' Referral Motion is the only solution that will keep <u>all</u> <u>litigation</u> among the parties in <u>one</u> <u>forum</u> -- the Bankruptcy Court.

C.    **Withdrawing The Reference In This Case Would**
      **Be Wasteful Of The Debtors' And Creditors' Resources**

31.    Resolving overlapping proceedings in a single forum promotes the economical use of parties' resources and the resources of the district and bankruptcy court by reducing the possibility of duplicate proceedings. *See Pension Benefit Guaranty Corp. v. Smith Corona Corp. (In re Smith Corona Corp.)*, 205 B.R. 712, 716 (D. Del. 1996).

32.    In support of its allegation that adjudicating the Standing Motion and the Adversary Proceedings in this Court would promote economic use of the parties' resources, John Hancock offers only the conclusory statement that this Court is more familiar with the evidentiary record established in the substantive consolidation proceeding, little additional discovery is required, and therefore, this Court, as opposed to the Bankruptcy Court, can resolve the issues raised in the Standing Motion and Adversary Proceedings more efficiently. This argument is unpersuasive. To the extent the evidentiary record in the substantive consolidation proceeding is relevant, whichever court resolves the Standing Motion and Adversary Proceedings must familiarize itself with the findings and conclusions the Third Circuit made in the Substantive Consolidation Decision. The Bankruptcy Court is equally able to review the evidentiary record and the Substantive Consolidation Decision.

33.    Moreover, John Hancock's contention that little additional discovery is necessary to support the actions that John Hancock seeks to pursue in this Court actually favors referring the Standing Motion and the Adversary Proceedings to the Bankruptcy Court, as any such discovery will be duplicative of the discovery John Hancock has already demanded in connection with the confirmation hearing. As noted above, if the Adversary Proceedings and the Standing Motion are heard by this Court, the parties will still be litigating in two courts. Parallel

and overlapping discovery and litigations in this Court and the Bankruptcy Court is wasteful of the Debtors' and creditors' resources.

34.    Courts also recognize that the length of time a bankruptcy court has presided over the proceeding is an important factor in determining where judicial resources are best spent. Withdrawing the reference to the bankruptcy court is a waste of judicial resources where the bankruptcy court has presided over the chapter 11 case for a lengthy period of time. *See AFCO Credit Corp. v. Iridium L.L.C.*, No. 01 CIV 3595, 2001 WL 1658233, at *1 (S.D.N.Y. 2001) ("where the bankruptcy court has been hearing matters related to Iridium's Chapter 11 case for approximately two years, it would be a waste of judicial resources...for [the district court] to address this matter."). Here, the Bankruptcy Court has presided over these chapter 11 cases for more than five years and, contrary to John Hancock's assertions, is thoroughly familiar with all of the events impacting on the Debtors chapter 11 cases. This fact, combined with the fact that withdrawing the reference with respect to the Equitable Subordination Adversary Proceeding will actually perpetuate parallel and overlapping litigations in two courts, demonstrates that the Bankruptcy Court is the appropriate forum in which to resolve the Standing Motion and the Adversary Proceedings.

**D.    Adjudicating The Standing Motion And The Adversary Proceedings In The Bankruptcy Court Will Expedite The Bankruptcy Process**

35.    John Hancock asserts that withdrawing the reference with respect to the Equitable Subordination Adversary Proceeding will expedite resolution of the Adversary Proceedings. *See* Withdrawal Motion at 15. The relevant inquiry, however, is whether withdrawing the reference will expedite the bankruptcy process. The hearings on confirmation of the Fifth Plan have been scheduled by the Bankruptcy Court and will commence in July of 2006. Having the Standing Motion and the Adversary Proceedings heard by the Bankruptcy

Court in connection with confirmation (they are, after all, confirmation objections) guarantees that such matters will be coordinated with the confirmation process. Conversely, litigating the Adversary Proceedings in this Court while at the same time litigating duplicative confirmation objections in the Bankruptcy Court will divert attention and resources from the confirmation hearings and subject them to delay.

36.     Moreover, if John Hancock were truly interested in expediting the confirmation process, the resolution by the Bankruptcy Court of its confirmation objections in connection with confirmation of the Fifth Plan is clearly the most expeditious route. Indeed, resolution of the Standing Motion and the Adversary Proceedings by the Bankruptcy Court will not prejudice John Hancock, as it will have every opportunity to engage in discovery and to appear and be heard on any objections it may chose to assert.

### E.     The Timing Of John Hancock's Withdrawal Motion Weighs Against Withdrawing The Reference

37.     Courts agree that eleventh-hour motions to withdraw the reference, which are designed to obfuscate the confirmation process, are not "timely." Rather, for a motion to withdraw the reference to be considered timely, it must be filed "at the first reasonable opportunity." As noted by the district court in *In re Baldwin-United Corp.*:

> In a Chapter 11 reorganization, for example, the determination of whether a motion is timely would turn somewhat on whether a reorganization plan and disclosure statement had already been prepared or approved. If a motion could have been filed earlier and it is filed at a time when it could delay and consequently jeopardize the reorganization, it would not be timely.

57 B.R. 751, 753 (S.D. Ohio 1985).

38.     In *Baldwin-United*, the United States District Court for the Southern District of Ohio considered whether a motion to withdraw the reference to the bankruptcy court was timely made. In that case, certain broker-dealers, who were defendants in a class action

alleging violations of federal securities laws, had filed a third-party complaint and contingent indemnification and contribution proofs of claim against the debtors for any liability the broker-dealers might incur in the class action. More than one year after filing the proofs of claim, and after *Baldwin-United* had filed its plan of reorganization, the broker-dealers moved to withdraw the reference to the bankruptcy court with respect to the liquidation of their proofs of claim. The broker-dealers asserted that their motion to withdraw the reference was "clearly timely" because they had filed such motion almost one month before the debtors had objected to such proofs of claim.

39.    The Ohio District Court found the broker-dealers' timeliness argument disingenuous, noting that the broker-dealers knew that their claims would be contested. *Id.* at 755. The court found that the broker-dealers had not filed the motion to withdraw the reference earlier because the broker-dealers thought they were winning the battle against the debtors (as third-party defendants) in the class action litigation. *Id.* The Ohio District Court also viewed the motion to withdraw the reference as untimely, given the status of the debtor's confirmation proceedings. *Id.* ("it is particularly important to avoid unnecessary delay in the proceedings. To that end we deem it particularly important to apply the timeliness requirement strictly."). Accordingly, the Ohio District Court held that the lack of timeliness alone sufficed to deny the motion to withdraw the reference. *Id.*

40.    Similar to the broker-dealers in *Baldwin-United*, here John Hancock has failed to act timely in its request to withdraw the reference with respect to the Equitable Subordination Adversary Proceeding because it thought it was winning in a separate litigation -- the substantive consolidation litigation. In fact, John Hancock did not commence the Equitable Subordination Adversary Proceeding until approximately three and one-half years after the

Fraudulent Transfer Adversary Proceeding was commenced and almost five months after the Substantive Consolidation Decision.[7] Moreover, just as in *Baldwin-United*, the Withdrawal Motion is not timely, "given the status of the [Debtors'] confirmation proceedings." *Id*. John Hancock cannot at this late stage rectify its miscalculation of neglecting the claims asserted in the Equitable Subordination Adversary Proceeding and relying on the Substantive Consolidation Motion and the Fraudulent Transfer Adversary Proceeding by now seeking to delay and obstruct the confirmation process through the Withdrawal Motion. Such motion is untimely and must be denied.

## IV.

## CONCLUSION

41.    For all of the foregoing reasons, the Standing Motion (and, if granted, the Fraudulent Transfer Adversary Proceeding) and the Equitable Subordination Adversary Proceeding should be heard by the Bankruptcy Court. Accordingly, the Court should grant the Debtors' Referral Motion for disposition together with the Equitable Subordination Adversary

---

[7] Importantly, John Hancock did not move to withdraw the reference at the time it filed the Equitable Subordination Adversary Proceeding. Rather, John Hancock first moved to withdraw the reference with respect to the Equitable Subordination Adversary Proceeding in response to the Debtors' Referral Motion.

Proceeding, and deny John Hancock's Withdrawal Motion.

WHEREFORE, Credit Suisse requests that the Court grant the relief requested in this Response and such other and further relief as is just.

Dated: Wilmington, Delaware
February 24, 2006

LANDIS RATH & COBB LLP

By: _____
Richard S. Cobb (I.D. No. 3157)
Rebecca L. Butcher (I.D. No. 3816)
919 Market Street, Suite 600
Wilmington, DE 19810
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

WEIL, GOTSHAL & MANGES LLP
Michael F. Walsh
Judy G.Z. Liu
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Kenneth H. Eckstein
Ellen R. Nadler
Jeffrey S. Trachtman
919 Third Avenue
New York, NY 10022
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

ATTORNEYS FOR
CREDIT SUISSE, AS AGENT

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                           .    Chapter 11
                                 .
OWENS CORNING, *et al.,*         .    Case Nos.00-03837(JKF)
                                 .    Jointly Administered
        Debtors.                 .
                                 .    Jan. 30, 2006 (10:43 a.m.)
                                 .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1           THE COURT: Mr. Rahl?

2           MR. RAHL: Good morning, Your Honor.  I think after

3   five years in this case I finally know where I stand.  It's

4   been a long time.  The reason for saying that, frankly, is

5   that for the last five years we have been working very

6   closely with the debtor, and we have certainly had no

7   complaints about the process over the last couple of months

8   in terms of discussions, disclosure, et cetera, between the

9   constituencies, and we have had, obviously extensive

10  conversations with Mr. Kruger's group, the Ad Hoc Committee

11  in that it is our understanding now that that Committee

12  represents virtually half of the bondholder constituency, 47

13  percent give or take, something like that.  We are the same

14  people who made a deal with the debtor two years ago, and we

15  really haven't changed, and I do want to address, I think,

16  two fundamental mis-characterizations of where we're coming

17  from at this point.  First and foremost, the litigation, so

18  to speak, that was filed in this Court and in the District

19  Court was commenced back in 2002 in the context of the flap

20  we had in Cybergenics where the Third Circuit ruled one way

21  and then reversed itself en banc a few months later.  These

22  actions were filed in the interim.  The Third Circuit again,

23  in it's Sub-Con opinion made express reference to the

24  fraudulent conveyance claims and other objections to the

25  bank's claims, and it became apparent to us at the end of

1    December when it's clear that there was not going to be any
2    consensual resolution with the bondholder constituency, that
3    we had to revive these claims.  The idea that we revived
4    these objections, many of which were brought by the debtor
5    itself initially, objections to the bank's claims and other
6    related issues, in no way reflects an intention to impose
7    another three years of litigation on this case.  I don't even
8    fundamentally disagree with the debtor's characterization of
9    at least some of these points as confirmation issues.
10   Indeed, one of the fundamental claims, if you will, in the
11   District Court litigation is in fact an objection styled as
12   an objection to the bank's claims.  It was so characterized
13   that way by the debtor, and we have retained that
14   characterization.  Our principal objective here is inasmuch
15   as a great deal of the discovery, by no means all that would
16   be necessary but a great deal of it has already been
17   completed in the context of the Sub-Con litigation.  Our
18   principal point here is to simply get the rest of this
19   discovery going out of the way before a confirmation hearing
20   is scheduled.  In the anticipation, I certainly know the
21   debtor is hopeful of getting something scheduled either late
22   summer, early fall in the anticipation that we will then be
23   in a position at a confirmation hearing to get rulings on all
24   of these issues in an appropriate and well-considered way.
25   So that's one point.  No objective whatsoever here to have

1    years and years of additional litigation.  We've already had
2    plenty of time to work out the issues and, as I said, I'd
3    say, I guess, I'd venture 85 percent of the discovery was
4    completed long ago and is still sitting in the data room.
5    Second point I would make is that the concept certainly as we
6    see it of terminating exclusivity, again, is not to delay
7    things.  Let's get two plans out the door, one that the
8    bondholders can agree on; one that the - the debtor's plan,
9    obviously, and simply have them voted on at the same time.
10   We'll use the same disclosure statement, slightly modified.
11   We've got plenty of time to get all that done in time for a
12   disclosure hearing, which, as I understand it, has been
13   scheduled for - Is it April 3rd in this case?  - April 5th in
14   this case.  I thought it was interesting that the settlement
15   terms in USG that were announced this morning, very similar,
16   actually, to what Mr. Kruger's group is proposing in terms of
17   plan structure, and, this way, no one in the case will run
18   the risk that we'll be stuck at the end of the day, that is
19   sometime this fall, with a plan that can't be confirmed
20   because one way or the other, certainly the plan that we have
21   in mind would treat asbestos the same way they're being
22   treated in the debtor's plan, one way or the other, we will
23   have one plan that can be confirmed.  And I certainly also
24   agree that until we get closer to that day, that the kind of
25   pressure that is being discussed in terms of timing and

1    leading into the kind of situation where a consensual
2    settlement can be reached, again, that is a dynamic that we
3    understand and support.  It has been.  It was the dynamic, I
4    think, that was in part behind the whole prior attempt to
5    confirm a consolidated plan.  I guess the final point I would
6    make is that, just to clarify, the nature of our group, if
7    you will, is, we represent in addition to the trade
8    creditors, I might add, also the sort of pure bondholder
9    constituency here, we pay a lot of attention to what Mr.
10   Kruger's group has to say.  That said, everyone knows they
11   have a lot of bank debt.  They even have some equity unless
12   I'm mistaken.  There are two bondholders left on the Official
13   Creditors Committee.  Five and a half years ago, the
14   Committee started with nine members.  Five of them have
15   resigned.  There are only two bank debt holders on that
16   Committee as well.  One of the bondholders is the indentured
17   trustee and Wilmington Trust, and they happen coincidentally
18   to be the indentured trustee for all of the debtor's $1.3
19   billion of senior bond debt.  So, they do speak for and have
20   a fiduciary duty to the entire constituency, just for the
21   record on that, Your Honor.  But in any event, the objective
22   here is to get two plans, presumably perhaps three, but I
23   suspect that one way or another, we could get it down - get
24   the number down to two, get them out the door at the same
25   time, tee them up at the same time on the same schedule, and

1    one way or another, Your Honor, get this case confirmed by

2    the end of the year.  Thank you.

3              THE COURT: Mr. Kruger?

4              MR. KRUGER: Your Honor, I think our papers maybe

5    say it all, but just for the record, I remember sitting here

6    and hearing Mr. Pernick telling the Court that the debtor

7    would continue to make whatever efforts are necessary to gain

8    the support of the banks, bonds, the ACC, and the Futures

9    Rep., and that they fully intend to continue to engage the

10   banks, the bondholders, the ACC, and the Futures Rep. in

11   substantive plan discussions prior to filing their amended

12   plan.   There have indeed been a couple of meetings, but

13   there have been no negotiations unless you take saying "no"

14   as negotiations.  There's been no negotiations, and that

15   really lead us to believe that we needed to object to

16   exclusivity in order to be able to propose a reorganization

17   plan that we believe would be confirmable and that would meet

18   the consent of all of the various constituencies.  The idea,

19   really, that there should only be one plan because it is

20   convenient to the parties and that that plan should result in

21   a prospective cram-down hearing since it's clearly

22   objectionable to the clients that we represent.

23             TELEPHONE OPERATOR: Please hold while your pass

24   code is being verified.  Four, 8, 9, 7, 9, 7 is not a pass

25   code that is valid at this time.  If you need further

1   is telling me that I have a conflict that day, but it's not

2   on the calendar so I don't know if I'm mis-recollecting the

3   day or it just hasn't made the calendar yet.

4           MR. PERNICK: Okay.

5           THE COURT: So, I'll give them to you, the 10th, 17th

6   and 18th, but you may get an order from me if I find out that

7   in fact I have a conflict on the 10th that will make it just

8   the 17th and 18th.

9           MR. PERNICK: Okay, I think that's fine.

10          THE COURT: Okay, so we'll reserve those days

11  anyway.

12          MR. RAHL: Your Honor, just for the record on the

13  question of dates.  We're happy to move ahead.  We do

14  anticipate there are a few points of discovery that we need

15  to pursue between now and July, and while I understand that

16  Mr. Pernick isn't in a position - Mr. Pernick and Mr. Monk

17  aren't in a position to start making commitments on the fly

18  about that, I just want to note for the record that we do

19  expect some reasonable cooperation from them in that regard.

20          THE COURT: Okay, well, I think at the outset of the

21  case I tried to make it clear that if you need discovery to

22  get ready for plan confirmation you're to get it.  So, to the

23  extent that you need it, I think it ought to start because I

24  really don't think the focus of the fight at this point is

25  going to be on the disclosure statement. So, I think we ought

1    to try to get through that and move to confirmation.

2         MR. RAHL: That's fine with us, Your Honor,

3    perfectly fine.

4         MR. PERNICK: Your Honor, I actually had a moment to

5    just confer with everybody.  I think if Mr. Rahl is agreeing

6    to litigate those issues all within confirmation, we will

7    agree that we will figure out cooperatively a discovery

8    schedule that accommodates the confirmation hearing dates

9    that Your Honor set.

10        THE COURT: Okay.

11        MR. RAHL: That's fine, Your Honor.

12        THE COURT: All right.

13        MR. GRAY: Your Honor, the Ad Hoc Committee -

14        THE COURT: You need to use the microphone, I'm

15   sorry.

16        MR. GRAY: I apologize, Your Honor.  The Ad Hoc

17   Committee reserves all rights with respect to objecting to

18   the disclosure statement.

19        THE COURT: Okay.

20        MR. GRAY: And also as to confirmation.

21        MR. PERNICK: Your Honor, so with those dates

22   actually the order that we presented and the request that we

23   made of July 31 may for today's purposes be acceptable.

24        THE COURT: Yeah, I think it probably is because

25   there may be some slippage in the dates in any event, so I